UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Craig Keefe,

        Plaintiff,

v.

                                          Civil No. 13-326 (JNE/LIB)
                                          ORDER

Beth Adams, Connie Frisch, Kelly McCalla,
Larry Lundblad, and Steven Rosenstone,

        Defendants.

---

Jordan S. Kushner, Law Office of Jordan S. Kushner, appeared for Craig Keefe.

Kathryn M. Woodruff and Tamar Gronvall, Office of the Minnesota Attorney General, appeared for Beth Adams, Connie Frisch, and Kelly McCalla.

---

After his removal from Central Lakes College's associate degree nursing program, Craig Keefe brought this action against several individuals associated with the college or Minnesota State Colleges and Universities. He asserted claims under 42 U.S.C. § 1983 (2012), alleging that the defendants denied him due process, violated his right to free speech, violated his right to be free from unreasonable searches and seizures, violated his right to privacy, and conspired to violate his constitutional rights. By stipulation, Keefe's claims against Larry Lundblad, the president of Central Lakes College, and Steven Rosenstone, the chancellor and chief executive officer of Minnesota State Colleges and Universities, as well as his claims of a conspiracy and of violations of his right to be free from unreasonable searches and seizures and his right to privacy, were dismissed. The remaining defendants—Beth Adams, Connie Frisch, and Kelly McCalla (collectively,

Defendants)—moved for summary judgment on the remaining claims.[1]  Keefe moved to

supplement the record after Defendants had submitted their reply.  For the reasons set

forth below, the Court grants Defendants' motion for summary judgment.  The Court

grants in part and denies in part Keefe's motion to supplement.

## I.      BACKGROUND

Keefe completed the practical nursing program at Central Lakes College in June

2011.  Later that month, he became a licensed practical nurse.  In fall 2011, Keefe

enrolled in the college's associate degree nursing program, which prepares licensed

practical nurses to become registered nurses.  The associate degree nursing program

requires students to attain at least 80% grade level in all nursing courses.  At the end of

the fall 2011 semester, Central Lakes College dismissed him from the associate degree

nursing program because he had failed to attain at least 80% grade level in all nursing

courses.  After his dismissal, Keefe applied again for admission to the associate degree

nursing program, the college admitted him, and he enrolled in fall 2012.  In October

2012, Keefe was placed on a student success plan, which acknowledged his potential

failure of at least one course.  Toward the end of the fall 2012 semester, Central Lakes

College dismissed him from the associate degree nursing program.  His second dismissal

from the program gave rise to this action.

As part of his enrollment in the fall 2012 semester, Keefe acknowledged receipt,

review, and understanding of the associate degree nursing program student handbook.

---

[1]      Keefe sued Adams, Frisch, and McCalla in their individual and official capacities.

The handbook states that "[a]ll current and future students are expected to adhere to the policies and procedures of this student handbook as well as all policies of clinical agencies in which the student is placed." It asserts that student learning outcomes "reflect the 4 program outcomes of the [National League for Nursing] Education Competencies Model and include outcomes related to Human Flourishing, Nursing Judgment, Professional Identity, and Spirit of Inquiry." With respect to professional identity, a graduate of the program is able to:

> demonstrate development of personal/professional behaviors by implementing one's role as a nurse in ways that reflect integrity, responsibility, ethical practices, and an evolving professional identity as a nurse committed to evidence-based practice, life-long learning, service learning/civic engagement, caring, advocacy, excellence, and safe quality care for diverse patients within a family and community context.

Under "Student Removal from Nursing Program," the handbook states that students who fail to meet professional standards are not eligible to progress in the program:

> Integral to the profession of nursing is a concern for the welfare of the sick, injured, and vulnerable and for social justice; therefore students enrolled in the Associate Degree (AD) Nursing Program at Central Lakes College (CLC) accept the moral and ethical responsibilities that have been credited to the profession of nursing and are obligated to uphold and adhere to the professional Code of Ethics. The *American Nurses Association (2001) Code for Nurses with Interpretive Statements* outlines the goals, values, and ethical principles that direct the profession of nursing and is the standard by which ethical conduct is guided and evaluated by the profession. The AD Nursing Program at Central Lakes College has an obligation to graduate students who will provide safe, competent nursing care and uphold the moral and ethical principles of the profession of nursing. Therefore, students who fail to meet the moral, ethical, or professional behavioral standards of the nursing program are not eligible to progress in the nursing program. Students who do not meet academic or clinical standards and/or who violate the student Code of Conduct as described in the Central Lakes College catalog and the AD Nursing Student Handbook are also ineligible to progress in the AD Nursing Program.

3

Behaviors that violate academic, moral, and ethical standards include, but are not limited to, behaviors described in the College Catalog Student Code of Conduct as well as:

- unsafe behavior in a clinical setting;

- academic dishonesty (see examples outlined in college catalog);

- behaviors that violate the Student Code of Conduct (see examples outlined in college catalog);

- transgression of professional boundaries;

- breaching of confidentiality/HIPAA (including any type of social media breach);

- behavior unbecoming of the Nursing Profession.

Students who fail to adhere to the CLC Student Code of Conduct and the moral and ethical standards outlined in the handbook are ineligible to progress in the Nursing Program. See CLC student catalog for procedures related to Grade Appeals and Student Grievance policies and procedures.

Reports about statements Keefe had made on his Facebook page started the process that culminated in Keefe's second dismissal from the associate degree nursing program. In November 2012, a student, who was enrolled in a lecture course with Keefe, expressed concerns to the instructor, Kim Scott, about statements Keefe had made online. The student regarded the statements as threatening and related to the classroom. Scott responded that she could not assess the statements without knowing exactly what Keefe had said. The next day, the student returned with a few pages that contained Keefe's statements. After reviewing them, Scott, who has almost 30 years' experience in the nursing field as a nurse, an instructor, and an administrator, concluded that they should be

brought to the attention of Connie Frisch, the college's dean of nursing since July 2012 and its director of nursing since 2009.[2]

Within a few days, a different student, who was enrolled in a clinical course with Keefe, approached Scott at the start of a clinical shift and asked to speak to her in private. Scott and the student stepped outside, and the student stated Keefe had made statements online that made the student upset, nervous, and uncomfortable. The student did not think she could function in the same space as Keefe. Scott separated the student from Keefe during the clinical shift. Later, the student sent to Scott an e-mail that contained Keefe's statements. Scott regarded the statements as very derogatory, inappropriate, and unprofessional. She forwarded the statements, as well as those that the first student had given to her, to Frisch.

The following statements were among those forwarded to Frisch:

- Can someone, anyone tell me wtf I need to continue to do a compentency and be evaluated on it. If I do a compentency such as write a care plan and get signed off on it that it is thorough and I have a great understanding about them than why must I continue or better yet what is the incentive to get it signed off. Controlling freaks. I cant wait for this shit to be done.

- Glad group projects are group projects. I give her a big fat F for changing the group power point at eleven lastnight and resubmitting. Not enough whiskey to control that anger.

- Very interesting. Apparently even if a male student has his Dr. Send letters to the instructors and director of the nursing program for test taking considerations they dont get them. But if your a female you can go talk to the instructors and get a special table in the very back

---

[2]     Frisch has worked for the college for several years. Before she became the dean of nursing, she was a practical nursing faculty member for 17 years and an associate degree nursing faculty member for a few years.

of the class with your back facing everyone and get to wear ear plugs.  And behind me at bat.  And you really shouldnt go around telling everyone that you beat the system and didnt need to follow the school policy and get a medical diagnosis to get special considerations.  I think its just one more confirmafion of the prejudice in the program.  Im taking notes thou….

- Doesnt anyone know or have heard of mechanical pencils.  Im going to take this electric pencil sharpener in this class and give someone a hemopneumothorax with it before to long.  I might need some anger management.

- LMAO, you keep reporting my post and get me banded.  I don't really care.  If thats the smartest thing you can come up with than I completely understand why your going to fail out of the RN program you stupid bitch….  And quite creeping on my page.  Your not a friend of mine for a reason.  If you don't like what I have to say than dont come and ask me, thats basically what creeping is isn't it.  Stay off my page….

- So . . . are you saying that you have never said Laura likes me I will make it, or She will let me do it for the test.  Just wondering why and for what reason you were creeping on my page.  Its really not your fault that the whole sexism thing happens in the nursing program.  But its really bull shit that you say the door distracts you on your test and there was four other seats in the classroom that was in normal position not to mention that you choose to sit where you sit.  I moved, but not that I still sit like the rest of the class, and I followed the guidelines of the college and still wasn't able to do what you did.  Which is fine.  I am way better than that.  I don't need to grasp for straws.  Without your faithful sidekick you aint shit.  You tried coming up to me when your sidekick wasnt there on your clinical and asking me how to give your solu-medrol  WTF read your MAR.  How can you give it is the first thing I would have asked myself, but of course you didnt even know the drug existed.  Its a very common drug.  Im going to tell you one more time.  Dont come on my page and try to justify your shit.  I was kind enough to not put names in and ID individuals, but you ID yourself.  You creeped my page.  Spend your spare time studying, you could use it.  Don't make me go where I don't need to or want to cuz I will.  Leave it alone.

After reviewing the statements and confirming that Keefe had made them on his Facebook page, which was not restricted,[3] Frisch contacted Kelly McCalla, the college's vice president for academic affairs.  McCalla stated that Frisch should meet with Keefe. In early December 2012, Frisch set up a meeting with Keefe and McCalla.  It was scheduled to take place on December 6.  Frisch did not tell Keefe that students had reported his statements on Facebook to Scott.

Late on December 3, Keefe asked Frisch via e-mail about the meeting:

> Im just dropping you an email in regards to our meeting.  Im not sure what situation or what exactly we are referring to.  I as anyone, am sitting here thinking and thinking of what and when I would have stepped out of my professional boundary as I continuously strive to meet my professional guidelines.  Just am wondering if you can give me some sort of idea what situation we are referring to so I can give my mind a break.

The next morning, Frisch responded to Keefe:

> I am sorry that you are distressed or worried about our meeting.  Thank you for quick response yesterday in returning my call and scheduling a meeting time for this Thursday . . . with VP Kelly McCalla.  I am cc'ing Mr. McCalla on my response here to keep him in the loop as well.
>
> As I said on the phone, I prefer to review the topic with you in person at that time rather that via phone or email.
>
> Please be assured that you do not need to prepare in anyway for our meeting, and though I appreciate that this is somewhat worrisome for you, we will discuss this on Thursday.  The topic of professional boundary is

---

[3]      Frisch explained how she confirmed Keefe made the statements:

> I have a Facebook account, but I am not "friends" with Plaintiff on Facebook, so with respect to his page I am like a member of the public.  By performing a simple search of Plaintiff's name on the Facebook web page, I was able to see Plaintiff's Facebook page, fully visible to the public, including the posts that the students had brought to Instructor Scott's attention.

central to the role of the nurse and I am sure you appreciate the delicacy of the topic.

Later on December 4, Frisch rescheduled the meeting to take place on December 5 in response to a report from Scott that a student had expressed concern about potential retaliation by Keefe.  At his deposition, Keefe acknowledged that he "would have" said there would be "hell to pay for whoever complained about" him.  During his conversation with Frisch, Keefe asked again about the purpose of the meeting.  According to Keefe's deposition testimony, Frisch reiterated that she would not explain it over the phone or via e-mail, but she did say that the meeting related to the college handbook's policy about due process.  After rescheduling the meeting, Frisch forwarded an e-mail, sent by Scott, to McCalla and another vice president.  Scott's e-mail reported a student's concern about the potential for retaliation by Keefe.  Frisch also described her conversation with Keefe:

> I did talk with the student and he will meet with us tomorrow at 10:00 at your office Kelly.  He sounded upset, and victimized saying he is being accused of things he did not do.  This was in response to my asking him to move the meeting up a day,I have not mentioned any content or even used the word accusation.  I did reassure him that we would be following due process and that his rights would be protected and that he would get the chance to speak and we would listen.  I am not sure if security should be around?

The meeting took place on December 5.  Keefe, Frisch, and Beth Adams, the college's dean of students, attended.  McCalla did not.  Before the meeting, Adams advised McCalla that he should not attend the meeting because he would hear any appeal by Keefe.

At her deposition, Frisch testified that she opened the meeting by reading a disciplinary policy from a student handbook.  Next, she articulated how the meeting

would progress: (1) notification of the charge; (2) presentation of evidence supporting the

charge; (3) opportunity to respond; (4) notification of the consequences; and (5)

information about the appeal process.  Frisch explained the charge in terms of boundary

issues and professionalism.  She told Keefe the charge related to statements on his

Facebook page.  Frisch reviewed the significant parts of a few pieces of paper that

contained his statements on Facebook.  She did not hand the pieces of paper to him, and

she did not review each statement with him.  To Frisch, Keefe's statement about a

hemopneumothorax[4] was the most disturbing.  His "not enough whiskey to control that

anger" statement did not bother her as much, but she did find it unprofessional.  Some of

his other statements contributed to her concerns about him.  Frisch afforded Keefe an

opportunity to respond.  According to Frisch, Keefe was surprised that his statements

were publicly available; he characterized at least some of the statements as a joke; and he

was not receptive to the message, conveyed by both Frisch and Adams, that his

statements were unprofessional.  Based on Keefe's lack of remorse, lack of concern, and

lack of recognition, Frisch decided to remove him from the associate degree nursing

program.  Because the semester was almost over, Frisch stated that Keefe could take his

final examinations, that he was excused from any remaining clinical shifts, and that he

would not be allowed to continue in the associate degree nursing program.  After

informing him of her decision, Frisch told Keefe about the appeals process.

---

[4]     According to Keefe's deposition testimony, a hemopneumothorax "is a punctured
lung with air being allowed into the lung pleural cavity along with blood."  It is not a
medical procedure.

At her deposition, Adams testified that she met with Frisch for approximately 30 minutes before their meeting with Keefe. Frisch told Adams about Keefe's statements on Facebook, Adams reviewed them, and Adams validated Frisch's concern about them. Frisch was considering Keefe's removal from the associate nursing degree program, but she wanted to hear from him before making a decision. After Keefe arrived, Frisch reviewed the allegation against him, showed copies of his statements on Facebook to him, and allowed him an opportunity to respond. Adams recalled that Frisch had expressed concerns about his statements as they relate to standards for nursing students in the nursing profession and that his statement about whiskey and anger stood out because he became argumentative during the discussion about it.

At his deposition, Keefe gave the following description of his meeting with Frisch and Adams. Frisch notified Keefe that the meeting related to transgression of professional boundaries and conduct unbecoming of the profession. She read from a student handbook the potential disciplinary action that could be taken. The actions included probation, suspension, removal from the program, and removal from the campus. Frisch stated that there were inappropriate comments on Keefe's Facebook page. Keefe asked her to identify the statements of concern, and she mentioned only the "stupid bitch" statement and the "not enough whiskey to control that anger" statement. Keefe explained that his Facebook page had been "hacked" a couple of weeks before the meeting,[5] that he did not intend to offend anybody, that his page included a lot of jokes,

---

[5]     Keefe acknowledged that he had made the statements of concern. He knew of no changes to his page except to his list of contacts.

and that he called his fellow student a "stupid bitch" only after the student had attacked him on his Facebook page.  Keefe testified that he was neither given nor shown any of the statements of concern, that Frisch had a stack of paper, that he saw only the top page of that stack, and that the top page contained the "stupid bitch" statement and the "not enough whiskey to control that anger" statement.  Frisch informed Keefe of her decision to remove him from the associate degree nursing program and to allow him to complete the semester's courses.  Frisch also told him that he could appeal the decision.  After informing Keefe of his removal from the program, Frisch held up a stack of papers, stated she had reviewed his Facebook page that morning, indicated she found the page disturbing, and said he had anger issues.  Keefe stated his page is private and mentioned the First Amendment.  Frisch cut him off, acknowledged his right to free speech under the First Amendment, and stated the issue goes beyond it.  Adams commented that she was disturbed by the "not enough whiskey to control that anger" statement.  Keefe replied that it was a quote from a television show.  Later that day, Keefe informed Frisch that he had decided to complete his courses.

After the meeting, Frisch sent a letter to Keefe.  Adams had reviewed it and suggested revisions.  In the letter, which is dated December 5, 2012, Frisch stated that Keefe had been removed from the associate degree nursing program "as a consequence of behavior unbecoming of the profession and transgression of professional boundaries" and that the charges were based on the content of his Facebook page.  She continued by quoting the section entitled "Student Removal from Nursing Program" in the associate degree nursing program's student handbook.  Frisch noted that Keefe had the right to

appeal the decision, that he could complete his current courses, and that he would be officially removed from the program upon the completion of the semester.  Frisch admonished Keefe not to retaliate against any students.  She closed by stating that he was ineligible for admission to the program in the future and that his ineligibility extended only to the associate degree nursing program.

Keefe decided to appeal the decision to remove him from the associate degree nursing program.  Before filing his appeal, he met with McCalla for a few minutes. Keefe asked for copies of his statements on Facebook that led to the decision to remove him from the program.  According to his deposition testimony, McCalla "shared the essence" of the statements with Keefe, but McCalla declined "to share the document with" Keefe.  Keefe reviewed his Facebook page, did not see any statements on it that he found "that extreme," and knew that the "stupid bitch" and "not enough whiskey to control that anger" statements were at issue.

On December 11, 2012, Keefe submitted his appeal to McCalla.  In it, he asserted that his removal from the associate degree nursing program was too harsh, that he was not aware of some comments on his Facebook page, that he nevertheless took responsibility for them, that he had removed "these offensive comments that offended individuals viewing [his] page as well as not displaying my professional image as a nursing student as well as CLC's nursing program," and that he had not previously been subject to any discipline at the college.  He described how he would conduct himself if allowed to continue in the program.  He closed his appeal by apologizing for his "unethical and unprofessional behavior."  McCalla reviewed the "academic disciplinary

policy," information received from Frisch, and Keefe's appeal.  McCalla testified that he was "reasonably sure" that he had also reviewed a nursing association's professional standards.  At his deposition, he was unable to "recall the specific standards on the website if [he] did in fact go look at them."  McCalla testified that he "saw nothing in Mr. Keefe's appeal that led [McCalla] to believe that [Keefe] had not violated that professionalism standard."  On January 2, 2013, McCalla called Keefe and left a message that informed Keefe of the denial of the appeal.  Approximately one month later, Keefe brought this action.

## II.     DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  In determining whether summary judgment is appropriate, a court must view genuinely disputed facts in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Defendants asserted that they did not violate Keefe's rights under the First Amendment by academically disciplining him for the statements he made on Facebook. They also maintained that Keefe received "constitutionally-appropriate due process." Even if Keefe could establish a violation of his constitutional rights, Defendants asserted that they are entitled to qualified immunity. Finally, Adams asserted that Keefe's claims against her should be dismissed because she did not decide to remove him from the associate degree nursing program, did not consider his appeal, and did not decide what procedures to follow. In response, Keefe argued that qualified immunity does not apply insofar as he seeks declaratory and injunctive relief, that Defendants are not entitled to qualified immunity, that his removal from the associate degree nursing program violated his rights to due process and free speech, and that Adams is liable to him. In reply, Defendants reiterated that Keefe had not submitted any evidence that raised a genuine issue of material fact as to whether they had violated his constitutional rights, that qualified immunity applied were Keefe able to establish a violation of his constitutional rights,[6] and that his claims against Adams should be dismissed because she did not cause any of the alleged violations of his constitutional rights.

---

[6]     Defendants also argued that Keefe had not shown he is entitled to injunctive or declaratory relief. After Defendants had submitted their reply, Keefe moved to supplement the record. He sought to submit material that he had cited but inadvertently failed to include in his response, as well as material to counter Defendants' assertion that he is not entitled to injunctive or declaratory relief. To the extent Keefe sought to supplement the record with material that he had inadvertently failed to include in his response, the Court grants the motion. The Court otherwise denies his motion and declines to consider the parties' arguments about whether Keefe is entitled to injunctive or declaratory relief. See D. Minn. LR 7.1(c)(3)(B).

A.      **Due process**

1.      **Procedural due process**

For present purposes, Defendants assumed that Keefe had a valid property interest in his enrollment in the associate degree nursing program.  *Cf. Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) ("[W]e assume without deciding that Monroe's interest in pursuing his education constitutes a constitutionally protected interest."); *Richmond v. Fowlkes*, 228 F.3d 854, 857 (8th Cir. 2000) ("Assuming, without deciding, the existence of a property or liberty interest, we conclude that Richmond received all the process that he was due."); *Hennessy v. City of Melrose*, 194 F.3d 237, 249-50 (1st Cir. 1999) ("[T]he claim to such a property interest is dubious, and in this case it seems especially tenuous because Salem State did not expel the appellant, but merely precluded him from continuing in a particular program." (footnote omitted) (citation omitted)). Defendants asserted that Keefe was dismissed from the program for academic reasons and that he received all the process that he was due.  Keefe asserted that he was dismissed for disciplinary reasons and that he was not afforded sufficient due process without regard to the characterization of his dismissal as academic or disciplinary.

"The term 'academic' in this context is somewhat misleading" because "[c]ourts have frequently held that an academic dismissal may be properly based on more than simply grades, particularly in a medical-professional context."  *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 550 (6th Cir.) (unpublished table decision), *cert. denied*, 134 S. Ct. 790 (2013); *see, e.g.*, *Bd. of Curators v. Horowitz*, 435 U.S. 78, 91 n.6 (1978) ("The record, however, leaves no doubt that respondent was dismissed for purely

academic reasons . . . .  Personal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness."); *Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005) ("The nexus between Dr. Fenje's lack of candor in the application process and his capacity to be trusted with patient care clearly pushes this decision into the realm of an academic dismissal."); *Ku v. Tennessee*, 322 F.3d 431, 435-36 (6th Cir. 2003) (concluding decision to place medical student on leave of absence based in part on student's "inability to interact with others in a basic professional manner" constituted an academic decision); *Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001) ("Although Shaboon's intransigence might suggest that her dismissal was disciplinary, her refusal to acknowledge and deal with her [mental] problems furnished a sound academic basis for her dismissal."); *cf. Monroe*, 495 F.3d at 595 ("[C]ourts have considered dismissals 'academic' in similar scenarios when the student's deficiencies, while arguably warranting disciplinary action, also bear on academic performance."). Keefe's removal from the associate degree nursing program is properly regarded as an academic decision.

"To satisfy the Fourteenth Amendment, a student who is dismissed for academic reasons from a public university must be afforded notice of faculty dissatisfaction and potential dismissal, and the dismissal decision must be careful and deliberate.  A formal hearing is not required for an academic dismissal." *Richmond*, 228 F.3d at 857 (citation omitted); *see Horowitz*, 435 U.S. at 85; *Monroe*, 495 F.3d at 595; *Schuler v. Univ. of Minn.*, 788 F.2d 510, 514 (8th Cir. 1986) (per curiam).

The record reveals that two of Keefe's fellow students separately brought statements that Keefe had made on Facebook to the attention of their instructor.  Scott was concerned that the statements violated rules of professional conduct and forwarded them to Frisch.  After confirming that Keefe had made the statements, Frisch scheduled a meeting with Keefe.  She did not provide any details about the subject of the meeting to him.  At the meeting, Frisch informed Keefe that the meeting related to transgression of professional boundaries and conduct unbecoming of the profession.  She read from a student handbook the potential disciplinary action that could be taken, including removal from the associate degree nursing program.  Frisch stated that there were inappropriate comments on Keefe's Facebook page.  According to Keefe's deposition testimony, Frisch specifically mentioned two comments, but he "knew there was obviously more than just one or two comments because [Frisch] had a whole stack of papers there."  Frisch gave Keefe an opportunity to explain his comments.  After listening to his explanation, Frisch decided to remove Keefe from the associate degree nursing program.  At her deposition, she explained the decision to remove him from the program:

> The fact that there wasn't a professionalism there.  Clearly there was a lot of confusion about the professionalism evidently by his comments, and that I didn't believe I could teach him.  He was not responsive to what I said.  You know, nursing programs have an obligation to graduate students who are not just able to pass the classes, but to be safe and to have all of the soft skills, including professionalism and be able to discern that.  I could not see that he had it.  In fact he convinced me that I wasn't going to be able to teach him that.

Frisch informed Keefe of his right to appeal the decision.  After the meeting, Frisch wrote a letter to Keefe.  Frisch stated that Keefe had been removed from the associate degree

nursing program "as a consequence of behavior unbecoming of the profession and

transgression of professional boundaries" and that the charges were based on the content

of his Facebook page; quoted the section entitled "Student Removal from Nursing

Program" in the associate degree nursing program's student handbook; and indicated that

Keefe could appeal the decision.  Before filing his appeal, Keefe met with McCalla, who

shared the essence of Keefe's statements with Keefe.  Later, Keefe appealed, and

McCalla denied the appeal.  Viewed in the light most favorable to Keefe, the record

reveals that Keefe received notice of faculty dissatisfaction and potential dismissal, and

that the decision to remove him from the associate degree nursing program was careful

and deliberate.  The Court therefore grants Defendants' motion on Keefe's procedural

due process claim.[7]

## 2.      Substantive due process

"Whether a student who is subject to academic dismissal may maintain a cause of

action for the violation of his right to substantive due process remains an open question."

*Richmond*, 228 F.3d at 859; *see Martinson v. Regents of Univ. of Mich.*, 562 F. App'x

365, 375 (6th Cir. 2014) ("As an initial matter, we note that the Supreme Court never has

held that the interest in continued education at a public university constitutes a

fundamental property or liberty interest that finds refuge in the substantive protections of

the Due Process Clause.").  "Even assuming, however, that such a cause of action does

exist, the student would still have to demonstrate arbitrary and capricious conduct on the

---

[7]      Keefe has not offered any evidence that Defendants engaged in a publication of
the sort at issue in *Greenhill v. Bailey*, 519 F.2d 5 (8th Cir. 1975).  His reliance on
*Greenhill* is misplaced.  *See Horowitz*, 435 U.S. at 88 n.5.

part of university officials by showing that there was no rational basis for the university's decision or that dismissal was motivated by bad faith or ill will unrelated to academic performance." *Schuler*, 788 F.2d at 515; *see Disesa v. St. Louis Cmty. Coll.*, 79 F.3d 92, 95 (8th Cir. 1996). When asked "to review the substance of a genuinely academic decision," a court "should show great respect for the faculty's professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). A court "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.*

Defendants asserted that Keefe's unprofessional conduct provided a rational basis for his dismissal from the associate degree nursing program. Keefe maintained that his removal from the associate degree nursing program had no rational basis because (1) the decision to remove "him was based on internet social media posts which were done outside the school setting, and had no relationship to any course requirements"; (2) he did not have an opportunity to fully explain himself because he was not presented with all of the offending posts; (3) Frisch misled Keefe by telling him there was no need to prepare for the meeting; (4) Frisch decided to remove Keefe from the program, "whereas she usually gave students probation for greater transgressions, not because of the egregiousness of his conduct but because he defended his rights rather than apologize and beg forgiveness"; and (5) there was no citation of "any specific rule, policy or standard applicable to the school which [he] violated."

As noted above, Keefe was enrolled in Central Lakes College's associate degree nursing program.  As a student in a professional program, he understood that he was subject to standards that govern the nursing profession.  Two students separately reported statements Keefe had made on Facebook to their instructor.  The instructor concluded that the statements raised concerns about his professionalism and forwarded them to Frisch.  In turn, Frisch confirmed that Keefe had made the statements, which were not restricted.  Keefe's statements belittled another student for receiving testing accommodations, asserted there was not enough whiskey to control the anger that arose out of a late change to a group project, professed his need for anger management, questioned whether anyone had heard of mechanical pencils and promised to give somebody a hemopneumothorax with an electric pencil sharpener, and called a fellow student a "stupid bitch."  Frisch met with Keefe, told him there were inappropriate statements on his Facebook page, and informed him of the range of consequences he faced.  To Frisch, Keefe's explanation revealed his lack of professionalism.[8]  His

---

[8]     The following exchange took place at Keefe's deposition.

Q:     Do you understand that being a license -- having a license means you're bound by any sort of code of ethics?

A:     No.  I mean, I do understand the ethics and professionalism when you're performing your job and per se in uniform, but other than that, I don't understand.

Q:     When you say you don't understand . . . you don't understand that it's part of holding the license?  Is that what you mean?

A:     I understand that there's ethics when you are performing your job as a nurse, and I understand that there are guidelines per se if you're on your

response convinced her not to offer him a student success plan, to which he had been

subject since October 2012.  Instead, she decided to remove him from the program.  She

informed him of his removal and sent him a letter that quoted the section entitled

"Student Removal from Nursing Program" in the associate degree nursing program's

student handbook.  Before submitting his appeal, Keefe spoke with McCalla, who

informed him of the essence of Keefe's statements.  Keefe appealed, and McCalla denied

the appeal.  Viewed in the light most favorable to Keefe, the record reveals that there was

a rational basis for the decision to remove Keefe from the associate degree nursing

program.  His removal from the program was not the product of arbitrary and capricious

conduct.  The Court therefore grants Defendants' motion on Keefe's substantive due

process claim.

## B.      Free speech

Defendants asserted that they did not violate Keefe's First Amendment rights by

imposing academic discipline on him because of his statements on Facebook.  According

to Defendants, "[c]ourts uniformly have held that enforcement of legitimate academic

requirements, including professionalism and general fitness for the field, does not run

---

way home from work or going to work, different types of environments or
places that you may go into while you're in uniform.  I understand that, but
on your own free time conversing with friends out in the fish house or
whatever, I don't understand the ethics behind that.

Q:      When you say you don't understand the ethics, you say that you
don't understand that it applies in those settings or -- I'm trying to
understand what you meant by that.

A:      Yeah, I don't understand the carryover of ethics from the job to your
personal life.

afoul of the [C]onstitution, particularly in the medical context." Citing *Yoder* and *Tatro*

*v. University of Minnesota*, 816 N.W.2d 509 (Minn. 2012), they asserted that "courts

have upheld against First Amendment challenge academic discipline for inappropriate

social media postings that violate academic professional standards." They contended that

they enforced recognized nursing standards against Keefe and that their interest in

enforcing those standards outweighed any First Amendment interest asserted by him.

        In response, Keefe asserted that Defendants violated his right to free speech by

removing him from the associate degree nursing program "in retaliation for his acts of

speech in a context that was unrelated to his school obligations and did not violate any

specific school rules." He maintained that the same free speech principles apply to

college students and the general public alike. He argued that he may not be disciplined

for his statements on Facebook because they did not constitute a true threat, they did not

cause a substantial disruption to the college or its nursing program, and they did not

violate any specific professional standards.

        Defendants countered that the "substantial disruption" and "true threat" standards

"are not implicated when assessing academic program rules." They reiterated that they

had not violated Keefe's rights under the First Amendment by holding him to the

associate degree nursing program's professionalism requirements.

        "[S]tate colleges and universities are not enclaves immune from the sweep of the

First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972); *see Bowman v. White*,

444 F.3d 967, 974 (8th Cir. 2006). "At the same time, however, in student speech cases,

'First Amendment rights must be analyzed in light of the special characteristics of the

school environment.'"  *Keeton v. Anderson-Wiley*, 664 F.3d 865, 871 (11th Cir. 2011)

(quoting *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981)).

Central Lakes College's associate degree nursing program prepares licensed

practical nurses to become registered nurses.  Part of the program is devoted to instilling

in students the standards of the nursing profession.  *See* Minn. Stat. § 148.251, subd. 1

(2012) (amended 2014); Minn. R. 6301.2320 (2011); Minn. R. 6301.2340, subp. 3

(2011).  The associate degree nursing program incorporated nationally established

nursing standards.  Its ability to discipline students for "behavior unbecoming of the

Nursing Profession" or "transgression of professional boundaries" reflects the ability of

the Minnesota Board of Nursing to "deny, revoke, suspend, limit, or condition the license

and registration of any person to practice professional, advanced practice registered, or

practical nursing" for "[e]ngaging in unprofessional conduct."  Minn. Stat. § 148.261,

subd. 1(6) (2012).  Greater specificity is not required.  *See Reyburn v. Minn. State Bd. of

Optometry*, 78 N.W.2d 351, 354-55 (Minn. 1956); *Stephens v. Pa. State Bd. of Nursing*,

657 A.2d 71, 75 (Pa. Commw. Ct. 1995); *Heinecke v. Dep't of Commerce*, 810 P.2d 459,

465-66 (Utah Ct. App. 1991).

Central Lakes College may hold students in its associate degree nursing program

to the standards of the nursing profession.  *See Keeton*, 664 F.3d at 876; *Marinello v.

Bushby*, 163 F.3d 1356 (5th Cir. 1998) (unpublished table decision); *Tatro*, 816 N.W.2d

at 521; *Oyama v. Univ. of Haw.*, Civ. No. 12-00137, 2013 WL 1767710, at *12-13 (D.

Haw. Apr. 23, 2013) ("The First Amendment does not require Defendants to accept

Plaintiff in a student teaching program if in their judgment he did not meet State and

National teaching standards."). Keefe was a licensed practical nurse enrolled in Central Lakes College's associate degree nursing program. He made statements on his Facebook page that belittled another student for receiving testing accommodations, asserted there was not enough whiskey to control the anger that arose out of a late change to a group project, professed his need for anger management, questioned whether anyone had heard of mechanical pencils and promised to give somebody a hemopneumothorax with an electric pencil sharpener, and called a fellow student a "stupid bitch." Access to his Facebook page was not restricted. Two of Keefe's fellow students separately brought his statements to Scott's attention. Concerned about Keefe's professionalism, Scott forwarded the statements to Frisch. In turn, Frisch confirmed that Keefe had made the statements, met with him, concluded that his statements were unprofessional, and determined that Keefe lacked the necessary professionalism to continue in the program. Her decision was upheld by McCalla. Viewing the record in the light most favorable to Keefe, the Court concludes that Defendants' removal of Keefe from the associate degree nursing program did not violate his rights under the First Amendment. The Court therefore grants Defendants' motion on his First Amendment claim.

## C.    Qualified immunity

"Qualified immunity shields a government official from liability unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.' Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burns v. Eaton*, 752 F.3d 1136, 1139 (8th Cir. 2014) (citation omitted). A court applies a two-step inquiry to determine

whether qualified immunity applies: (1) whether the facts shown by the plaintiff demonstrate a violation of a constitutional right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014).

For the reasons set forth above, the record, viewed in the light most favorable to Keefe, does not demonstrate that Defendants violated Keefe's constitutional rights to free speech and due process. Were Keefe able to establish a violation of his constitutional rights, Defendants would be entitled to qualified immunity because no violation of a clearly established right took place. *See Martinson*, 562 F. App'x at 375 ("As an initial matter, we note that the Supreme Court never has held that the interest in continued education at a public university constitutes a fundamental property or liberty interest that finds refuge in the substantive protections of the Due Process Clause."); *Yoder*, 526 F. App'x at 544-47 (holding that any First Amendment right allegedly violated by Defendants in disciplining nursing student for posting statements about a birth she had witnessed as part of clinical program was not clearly established); *Yoder*, 526 F. App'x at 549-51 ("We further find that Defendants were not objectively unreasonable in concluding that the processes used in Yoder's dismissal afforded Yoder adequate due process."); *Richmond*, 228 F.3d at 859 ("Whether a student who is subject to academic dismissal may maintain a cause of action for the violation of his right to substantive due process remains an open question.").[9]

---

[9]     Having concluded that Defendants did not violate Keefe's constitutional rights and that no violation of a clearly established right took place, the Court need not consider the

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated

above, IT IS ORDERED THAT:

1.    Defendants' Motion for Summary Judgment [Docket Nos. 37 & 50] is
      GRANTED.

2.    Keefe's motion to supplement [Docket No. 60] is GRANTED IN PART
      and DENIED IN PART.

3.    Keefe's claims against Adams, Frisch, and McCalla in Counts 1 and 2 of
      the Complaint are DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 26, 2014

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

---

parties' arguments regarding Adams's role in Keefe's removal from the associate degree
nursing program.